1
2
3
4
5
6

7           IN THE UNITED STATES DISTRICT COURT

8           FOR THE EASTERN DISTRICT OF CALIFORNIA

9    RONALD FOSTER,

10              Plaintiff,                     No. CIV S-03-1113 DFL JFM P

11        vs.

12   D. L. RUNNELS, et al.,

13              Defendants.          FINDINGS & RECOMMENDATIONS

14   _____/

15              Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to

16   42 U.S.C. § 1983.  Plaintiff claims that defendant Warden D. L. Runnels violated his Eighth

17   Amendment rights by implementing a policy permitting correctional staff to deny inmates meals

18   as a disciplinary measure, and that defendant Cole violated his constitutional rights by denying

19   him meals and showers on several occasions.  Defendants' May 10, 2005 motion for summary

20   judgment is now before the court.  Defendants seek summary judgment on the grounds that

21   plaintiff cannot state a constitutional violation against these defendants and defendants are

22   entitled to qualified immunity.

23              SUMMARY JUDGMENT STANDARDS UNDER RULE 56

24              Summary judgment is appropriate when it is demonstrated that there exists "no

25   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

26   matter of law."  Fed. R. Civ. P. 56(c).

1

1    Under summary judgment practice, the moving party

2    always bears the initial responsibility of informing the district court
     of the basis for its motion, and identifying those portions of "the
3    pleadings, depositions, answers to interrogatories, and admissions
     on file, together with the affidavits, if any," which it believes
4    demonstrate the absence of a genuine issue of material fact.

5    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

6    nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

7    judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

8    to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

9    after adequate time for discovery and upon motion, against a party who fails to make a showing

10   sufficient to establish the existence of an element essential to that party's case, and on which that

11   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

12   concerning an essential element of the nonmoving party's case necessarily renders all other facts

13   immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

14   whatever is before the district court demonstrates that the standard for entry of summary

15   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

16       If the moving party meets its initial responsibility, the burden then shifts to the

17   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

18   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

19   establish the existence of this factual dispute, the opposing party may not rely upon the

20   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

21   form of affidavits, and/or admissible discovery material, in support of its contention that the

22   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

23   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

24   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

25   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

26   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

1    return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

2    1436 (9th Cir. 1987).

3          In the endeavor to establish the existence of a factual dispute, the opposing party

4    need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

5    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

6    versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

7    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

8    genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

9    committee's note on 1963 amendments).

10          In resolving the summary judgment motion, the court examines the pleadings,

11   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

12   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

13   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

14   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

15   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

16   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

17   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

18   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

19   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

20   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

21   'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

22          On September 15, 2003, the court advised plaintiff of the requirements for

23   opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

24   Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and

25   Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

26   /////

ANALYSIS

II.  Facts

      a.  <u>Undisputed Facts</u>

      1.  Plaintiff, an African American, was housed on Facility C, Building 2 at HDSP from June 2001 through August 2001, and subsequently transferred to Facility C, Building 3 at HDSP.  (Amended Complaint at 5 and Exs. A, B.)

      2.  While defendant Runnels toured the institution in 2001, he noticed security windows had been covered which violated institutional policy.  (Runnels' Dec. at 2; Pl.'s Opp'n at 5.)  Warden Runnels wrote a memo dated February 15, 2001, which read as follows:

> Recently issues were raised regarding inmates covering their cell windows and displaying pornography in their cells.  Both window coverings and pornography are in violation of departmental/ institutional policy and procedure.  It is not acceptable for inmates to cover their cell windows or display pornography at any time.  Cell windows are designed for security and the safety of staff and inmates.
>
> To ensure the safety and security of the institution it is my expectation that all staff will enforce departmental institutional policy and procedure.
>
> If you have any questions or concerns, feel free to contact your immediate supervisor.

(Pl.'s Opp'n., Ex. A.)

      3.  Facility C Sergeants and Lieutenants issued a memo dated July 27, 2001, which read as follows, in pertinent part:

> Subject: IN-CELL COVERINGS
>
>     The purpose of this memorandum is to reiterate policies and procedures already in place regarding window/incell coverings. The only authorized area of a cell that pictures can be placed on any cell wall is to the side of the shelving unit nearest the back cell wall.  (*For the purpose of this memorandum pictures are defined as personal photographs.*) . . . .
>
>     Window coverings are not authorized at any time and if discovered, may be confiscated and constitute the initiation of the

4

> progressive disciplinary process.  Facility staff has been instructed
> that window coverings must be removed from all of the cell
> windows, front and back, and the bright light on before the
> food/handcuff port is opened.  Any inmate failing to comply with
> this directive will result in his forfeiture of participation in the
> current activity, i.e. showers, yard, library, meals, etc.
>
> All housing unit staff have the day to day responsibility of
> enforcing the above mentioned direction and all inmates on Facility
> C have the responsibility to comply with this written direction.
> Housing Unit Sergeants will ensure this is occurring in their
> assigned units.

(Pl.'s Opp'n., Ex. A.)  Warden Runnels had no personal knowledge of this July 27, 2001

memorandum.[1]  (Runnels' Decl. at 3.)  Issuance of directives by memorandums may be within

staff's scope and authority depending on their rank and position.  (Runnels' Decl. at 3.)  For

example, a Chief Deputy Warden, Associate Warden or a Facility Captain may issue directives

by memorandums depending on the subject matter.  (Runnels' Decl. at 3.)

          4.  On or about September 12, 2001, it came to Warden Runnels' attention that

some inmates were not receiving their regular meals because they were not complying with the

directives outlined in the July 27, 2001 memorandum.  (Runnels Decl. at 3-4.)  On September 12,

2001, Warden Runnels issued a clarification memo concerning the feeding of inmates with

window coverings:

> It has recently come to my attention that staff has taken it upon
> themselves to not feed  inmates based upon the belief that any type
> of window covering presents a security risk.  The purpose of this
> memorandum is to communicate my expectations regarding
> feeding and the impact of window coverings.
>
> Staff safety is always a concern whenever cell feeding is being
> conducted.  Whenever inmates do not have their cell lights on,
> have their front windows covered, or staff feels there is a
> substantial risk to safety, I do not expect them to open the food port
> and put their safety in jeopardy.  However, staff is not to construe
> this as permission to not feed the inmates.

---

[1]  Although plaintiff's unsworn opposition contains arguments disputing this statement,
plaintiff's declaration and affidavit contain no statements or evidence as to defendant Runnels.

Whenever staff feels that there is a substantial risk to their safety, staff should instruct the inmates to remove the window coverings or turn on the lights as applicable. If the inmates refuse to do so, then staff shall continue feeding the rest of the building and then IMMEDIATELY inform their supervisor of the situation.

The supervisor shall evaluate the situation and give the inmates orders to comply with removing the window coverings, turning on the lights, etc. If the inmates refuse, they are to be instructed to back up to the food port to be placed in mechanical restraints and removed from the cell. If the inmates refuse to be removed, then the Facility Captain or Administrative Officer-of-the-Day, shall be advised of the situation and a tactical use of force, cell extraction implemented. If the inmates comply with being removed from the cell, staff will remove the window coverings and a CDC-115, Rules Violation Report, will be issued. The inmates will then be returned to their cell and fed.

In summary, inmates ARE to be fed when it is safe to do so. When security concerns arise, staff may temporarily suspend feeding the inmates until their supervisor adequately addresses the security concerns.

Supervisors are expected to take action to ensure that these expectations are adhered at all times. If you have further questions, please feel free to contact your immediate supervisor.

(Pl.'s Opp'n., Ex. A.)

5. On July 21, 2001, defendant Cole did not provide plaintiff with breakfast or lunch. On this date, plaintiff turned on his bright light when Cole approached with lunch. (Cole Decl. at 4.)

6. On July 28, 2001, defendant Cole did not provide plaintiff with breakfast or lunch.

7. On another occasion in July or August, 2001, defendant Cole did not provide plaintiff with breakfast or lunch.

8. On each occasion defendant Cole approached plaintiff's cell to provide food, plaintiff failed to remove all paper out of the back windows of his cell. (Opp'n. at 8.)[2]

---

[2] Defendant Cole contends plaintiff refused to remove his window coverings. (Cole Decl. at 4, 6, 7.) Plaintiff contends he turned on his bright light and removed a 4 inch piece of

1        9.  Plaintiff was not allowed to shower on at least two occasions.[3]

2        10.  On or about June 10, 2001, defendant Cole responded to an incident on

3   Facility B at HDSP where two black inmates attempted to murder a female correctional officer.

4   (Cole Decl. at 2.)  The victim officer was beaten and unconscious when defendant Cole arrived at

5   the scene.  (Cole Decl. at 2.)  Defendant Cole was physically sick to her stomach at the sight of

6   the scene.  (Cole Decl. at 2.)  Defendant Cole accompanied the injured officer to the county

7   hospital for treatment.  (Cole Decl. at 2.)  The institution was placed on lockdown as a result of

8   this incident.  (Id.)

9        11.  Following the June 10, 2001 incident, "several incidents occurred on Facility

10  C wherein the Black inmate population were being disruptive, aggressive and assaultive towards

11  staff." (Decl. of Correctional Counselor F. Money, at 1-2.)  From June 14, 2001 through July 17,

12  2001, there were seventeen[4] separate incidents on Facility C involving black inmates where staff

13  was "subjected to resistive and obstructive behavior, threats of violence or verbal and physical

14  assaults." (Runnels' Decl. at 2.)  Staff discovered inmate manufactured weapons in cells

15  occupied by black inmates on Facility C.  (Id.)  "As a result of this disruptive and aggressive

16  behavior, the Black inmate population on Facility C yard numbers one and two remained on

17  lockdown status." (Id.)  None of these incidents were attributed to plaintiff.

18  /////

19  /////

20  ────────────────────

21  paper out of the front side window of his cell, but refused to move to the back of the cell or
    remove the coverings from his back windows.  (Opp'n. at 8.)

22      [3]  Plaintiff contends defendant Cole refused to allow plaintiff to shower on July 21, 2001
23  and July 28, 2001.  (Foster Decl. at 2.)  Defendant Cole does not specifically address particular
    incidents where she did not allow plaintiff to have a shower, but states that had plaintiff complied
24  with her requests to remove his window coverings, she would have had a clear view of his cell
    and could have safely opened the food/cuff port to handcuff plaintiff and escort him to the
25  showers.  (Cole Decl. at 7.)  Because defendant Cole used the plural word "showers," it would
    appear defendant Cole did not allow plaintiff to shower on at least two separate occasions.

26      [4]  These incidents are described in detail in Correctional Counselor Money's Declaration.

1    12.  Of the 17 separate incidents, three involved the food/cuff port:

2    On June 14, 2001, a black inmate committed battery on a peace
     officer.  During this incident, an officer was attempting to place an
3    inmate into handcuffs in order to escort him to the shower.  After
     the officer secured the inmate's right wrist, the inmate quickly
4    turned to his right and used his arm strength and body weight to
     pull the officer's arm through the food/cuff port before she could
5    let go of the handcuffs.  This caused the officer's arm to scrape the
     food/cuff port and as a result she was transported to Lassen
6    Community Hospital for further evaluation.

7  (Money Decl. at 2.)

8    On June 15, 2001, two black inmates committed battery on a peace
     officer.  Returning the inmate to his cell after his shower, the
9    inmate's cellmate was placed in handcuffs so the cell door could be
     opened.  Once both inmates were in the cell, the cellmate's
10   handcuffs were removed.  As the officer began removing the
     returning inmate's handcuffs, the cellmate turned off the lights.
11   The officer shut the food/cuff port and ordered the cellmate to turn
     the lights back on.  The inmate complied with the order.  The
12   officer reopened the food/cuff port and removed the handcuffs
     from the returning inmate.  Once the cuffs were removed, the
13   inmate spun around and grabbed the officer's hand.  The inmate
     forcibly grabbed the officer's hand through the food port
14   approximately 2 inches before he was able to break free from the
     inmate's grasp.  A Sergeant and a Lieutenant responded to the cell
15   and ordered the inmates to submit to handcuffs, but neither inmate
     complied.  Cell extraction teams were put together but were not
16   used as both inmates eventually complied with orders to submit to
     handcuffs.

17

18 (Money Decl. at 2.)

19   On July 5, 2001, a Black inmate was being returned to his cell after
     an institutional mandatory cell search.  An officer was removing
20   the handcuffs from the inmate's left hand when the inmate turned
     and pulled the handcuffs still attached to his right wrist into the
21   cell.  The officer had to hang onto the handcuffs temporarily so that
     his hand would not be pulled in through the food port with the
22   cuffs, and therefore, the officer pulled back on the handcuffs.  As
     soon as the officer could safely let go of the cuffs he did, and the
23   inmate pulled the handcuffs into the cell.

24 (Money Decl. at 4.)  None of these incidents were attributed to plaintiff.

25 /////

26 /////

8

1       13.  Weapons were confiscated from black inmates or their cells on six separate

2   occasions from June 14, 2001 through July 10, 2001.  (Money Decl. at 2, 3, 4, 5.)  None of these

3   weapons were confiscated from plaintiff or his cell.

4       14.  On July 16, 2001 and July 17, 2001, two black inmates covered their cell

5   window in Facility C (Buildings 1 and 5, respectively) with paper and were cell extracted.

6   (Money Decl. at 5.)  None of these actions were attributed to plaintiff.

7       15.  When an institution is on lockdown, inmates are not permitted to leave their

8   cells for meals because it is not safe.  (Runnels Decl. at 3.)  Instead, inmates are provided every

9   meal in their cells via the food/handcuff port in the cell door.  (Id.)  Food must be distributed

10  within 20-30 minutes of being taken from the kitchen so that the food remains a certain

11  temperature to prevent the possible growth of bacteria.  (Cole Decl. at 15.)

12      16.  Plaintiff is 6'3" tall and lost at least 9 pounds between February 2001 to

13  October 2001.[5]  (Dr. Roche Decl. at 2; Opp'n. at Ex. D.)

14      17.  Cell windows are designed for the safety and security of staff and inmates.

15  (Runnels Decl. at 1.)  Window coverings are in violation of departmental/institutional policy and

16  procedure.  (Id.)  Departmental policy prohibits inmates from covering their cell windows at any

17  time.  (Id.)  If window coverings are discovered, they may be confiscated and the progressive

18  disciplinary process may be initiated.  (Id. at 2.)

19  /////

20

21      [5] Plaintiff contends he lost 15 pounds in two months.  (Foster Decl. at 5.)  However,
    plaintiff does not explain how he derived his 15 pound figure or the time period.  Plaintiff
22  submitted copies of medical records that reflect he weighed 230 pounds in June of 2000, 226
    pounds on February 15, 2001, 217 pounds in October of 2001, 229 pounds in January of 2002,
23  227 pounds in June of 2002 and 230 pounds in July of 2002.  (Opp'n. at Ex. D.)  Plaintiff
    declared he weighed 230 pounds prior to June 10, 2001 (Foster Affidavit at 1), but subtracting
24  the October 2001 weight of 217, equals 13 pounds, not 15.
        The gravamen of plaintiff's case involves deprivations occurring primarily from June to
25  September, 2001.  Thus, plaintiff's documented weight loss from February, 2001 through
    October, 2001 (226 - 217 = 9 pounds), is the undisputed minimum number of pounds plaintiff
26  lost for the relevant time period herein.

b. <u>Disputed Facts</u>

1.  Plaintiff contends defendant Cole also failed to provide him breakfast and lunch on the following days:  July 22, 2001, July 29, 2001, August 4, 2001, August 5, 2001, August 11, 2001 and August 12, 2001.  (Foster Decl. at 5.)  Plaintiff provided two inmate declarations in support of his claims.  Inmate Matthews, housed in the cell above plaintiff, declared that on July 21, 2001, he witnessed defendant Cole refuse to feed plaintiff because he would not take a piece of paper out of his back window.  (Matthews Decl. at 1.)  Matthews also declared he witnessed defendant Cole refuse to feed plaintiff on numerous occasions for at least one month starting in July of 2001 until around September 2001; Matthews declared he heard defendant Cole tell plaintiff "that until he start[ed] taking that piece of paper out of his window he will not be fed."  (Matthews Decl. at 1.)

Inmate Williams, who lived in the next cell, declared that during the period of July 2001 through August 2001 he witnessed defendant Cole refuse to feed plaintiff for not taking paper off the window in the back of the cell.  (Williams Decl. at 1.)  Williams further declared that on the first occasion he heard plaintiff tell defendant Cole that as long as his bright light was on she could not refuse to feed plaintiff because of a piece of paper on the back window, but that defendant Cole responded that if plaintiff did not take the paper off, he would not get fed.  (Williams Decl. at 1.)

Plaintiff contends Cole refused to feed him again on October 31, 2002 (Foster Decl. at 3.); however, after plaintiff explained what happened to Officer Brazil, Officer Brazil brought plaintiff a lunch without requiring plaintiff to remove any window coverings.  (Opp'n. at 9.)

Plaintiff contends Cole refused to feed him breakfast on January 2, 2003.  (Foster Decl. at 4.)  Plaintiff declared he turned on his bright light, but defendant Cole simply refused to hand him the tray.  (<u>Id.</u>)  Plaintiff stated about thirty minutes later, Cole returned, asked for the tray, then "humorously" stated:  "That's right I didn't feed you."  (Foster Decl. at 4.)

1        Defendant Cole declared that on January 2, 2003, she was assigned to C Facility,

2    Building 3, as a floor officer and believed that on or about this date she had to contact either her

3    supervisor or her partner in regard to plaintiff and his refusal to remove a window covering.

4    (Cole Decl. at 8.)

5        2.  Plaintiff contends he lost 15 pounds over the two month period in which

6    defendant Cole refused him meals.  (Foster Decl. at 5.)

7    II.  <u>Legal Standards</u>

8        Plaintiff's Eighth Amendment claims are grounded on that amendment's

9    prohibition of cruel and unusual punishment.  The Eighth Amendment to the United States

10    Constitution protects inmates from the infliction of cruel and unusual punishment.  Prison

11    officials, therefore, have a duty under the Eighth Amendment to provide humane conditions of

12    confinement.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994); <u>Hudson v. Palmer</u>, 468 U.S. 517,

13    526-27 (1984).  Consistent with that duty, prison officials must ensure that inmates receive

14    adequate food, clothing, shelter, and medical care and must take reasonable measures to

15    guarantee inmate safety.  <u>Id.</u>  The Eighth Amendment, however, "does not mandate comfortable

16    prisons," <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981), and does not provide relief for

17    perceived acts of negligence on the part of prison officials.

18        To prevail on an Eighth Amendment claim based on prison conditions, an inmate

19    must establish both an objective and a subjective element.  Objectively, the deprivation must be

20    "sufficiently serious."  <u>Farmer</u>, 511 U.S. at 834 (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298

21    (1991)).  In other words, "a prison official's act or omission must result in the denial of 'the

22    minimal civilized measure of life's necessities.' "  <u>Farmer</u>, 511 U.S. at 834 (quoting <u>Rhodes</u>, 452

23    U.S. at 347).  Subjectively, the prison official must have acted with a "sufficiently culpable state

24    of mind."  <u>Farmer</u>, 511 U.S. at 834 (quoting <u>Wilson</u>, 501 U.S. at 297).  In cases involving prison

25    conditions, that state of mind is one of "deliberate indifference."  <u>Farmer</u>, 511 U.S. at 834

26    (quoting <u>Wilson</u>, 501 U.S. at 302-03).  A prison official's conduct does not rise to the level of

1  deliberate indifference unless he "knows of and disregards an excessive risk to inmate health or

2  safety." Farmer, 511 U.S. at 837.  In other words, the "official must both be aware of facts from

3  which the inference could be drawn that a substantial risk of serious harm exists, and he must

4  also draw the inference." Id.  The subjective element "entails something more than mere

5  negligence." Id. at 835.

6          Adequate food is a basic human need protected by the Eighth Amendment.  See

7  Keenan v. Hall, 83 F.3d 1038, 1091 (9th Cir.1996), amended, 135 F.3d 1318 (9th Cir.1998).  The

8  Eighth Amendment requires only that prisoners receive food that is adequate to maintain health.

9  See LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir.1993).  However, "[s]ome conditions of

10 confinement may establish an Eighth Amendment violation "in combination" when each would

11 not do so alone, but only when they have a mutually enforcing effect that produces the

12 deprivation of a single, identifiable human need such as food, warmth, or exercise – for example,

13 a low cell temperature at night combined with a failure to issue blankets." Wilson v. Seiter, 501

14 U.S. 294, 304 (1991).  The circumstances, nature, and duration of a deprivation of these

15 necessities must be considered in determining whether a constitutional violation has occurred.

16 "The more basic the need, the shorter the time it can be withheld." Hoptowit v. Ray, 682 F.2d

17 1237, 1259 (9th Cir. 1982).

18 A.  Deprivation of Showers

19         It is undisputed that plaintiff was deprived of a shower on at least two occasions.

20 This court cannot find that the deprivation of a shower on two occasions demonstrates that

21 plaintiff was deprived of the minimal civilized measure of life's necessities, thus failing to meet

22 the objective prong of Farmer, supra.  This claim should be denied.

23 B.  Warden Runnels

24         It is undisputed that once Warden Runnels became aware that inmates were not

25 getting fed based on window coverings in their cells, he issued a memorandum clarifying the

26 policy surrounding window coverings and reinforcing his position that staff should not use this

1  policy to deprive inmates of their meals.  Warden Runnels implemented a policy by which staff

2  members would seek their supervisors' assistance when inmates refused to comply with the

3  window covering policy, which could ultimately result in a cell extraction, depending on the

4  response of the inmate.  Defendant Runnels has provided evidence that this new policy was

5  followed on at least two occasions.   (Money Decl. at 5.)

6          Plaintiff has failed to demonstrate that there was a causal link between Warden

7  Runnels and the actions of defendant Cole herein.  Monell v. Dep't of Social Services of the City

8  of New York, 436 U.S. 658, 694 (1978).  Applying the Farmer standard set forth above, this

9  court finds there is insufficient evidence in the record to sustain plaintiff's  Eighth Amendment

10  claim against Warden Runnels.  Plaintiff argues that defendant Cole's declaration states that she

11  relied on Runnels' February memo to withhold food from plaintiff prior to the issuance of

12  Runnels' clarification memo in September.  However, defendant Cole's declaration states only

13  that she was instructed to enforce departmental/institutional policy and procedure concerning the

14  cell window coverings to ensure the safety and security of the institution.  (Cole Decl. at 2.)

15  Moreover, Warden Runnels' February memo did not expressly state that the correctional officers

16  could withhold meals as a disciplinary response to inmates' failing to uncover their cell windows.

17  Indeed, the memo made no mention of the food/cuff port or of feeding inmates at all.

18          Finally, plaintiff has submitted no evidence to controvert Warden Runnels'

19  declaration that he had no personal knowledge of the July 27, 2001 memo.  As noted above, once

20  Warden Runnels became aware inmates were not being fed, he promptly issued his clarification

21  memo that expressly set forth reasonable and alternative procedures to use should inmates refuse

22  to comply with orders to remove cell window coverings.  Thus, Warden Runnels should be

23  entitled to summary judgment.

24  /////

25  /////

26  /////

C.  Defendant Cole

       1.  Objective Prong:  Sufficiently Serious Deprivation

       Plaintiff must demonstrate that he has suffered a sufficiently serious deprivation of the minimal civilized measure of life's necessities.  The more basic the need, the shorter the time it can be withheld.  See Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir.2000).  Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim.  See id. at 732-733.

       There is little Supreme Court or Ninth Circuit case law providing guidance on this issue.  The Supreme Court has indicated that prison inmates may be placed under conditions of confinement that include a restricted diet for limited periods of time.  Hutto v. Finney, 437 U.S. at 686-87 ("[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months");[6] Johnson v. Lewis, 217 F.3d 726, 732 (9th Cir.2000) (reversing grant of summary judgment for defendants on plaintiffs' Eighth Amendment claim when there was evidence in record that plaintiffs had been denied "edible" food and "adequate" water for four days).  But no Supreme Court case has directly faced the questions of whether, under what circumstances, and for how long, prison officials may deliberately withhold all food from an inmate.

       The Second Circuit has noted that "[w]hile no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."  Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir.1983) (citing Cunningham v. Jones,

---

     [6]  "Grue" is a "substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs and seasoning into a paste and baking the mixture in a pan."  Hutto v. Finney, 437 U.S. at 683.  The inmates in Hutto were fed less than 1,000 calories per day, much less than the approximately 2,000 calories per day expended by a mature man spending 12 hours a day lying down and 12 hours a day simply sitting or standing.  Id.

567 F.2d 653, 659-60 (6th Cir.1977) (dismissal of a complaint alleging inmates were served only one meal a day for 15 days remanded for finding of nutritional adequacy);[7] and <u>Moss v. Ward</u>, 450 F.Supp. 591, 596-97 (W.D.N.Y.1978) (deprivation of food for four days held to be unconstitutionally disproportionate punishment for violation of a disciplinary rule while recognizing that deprivation of one or two meals may not be cruel and unusual punishment); <u>see also</u> <u>Phelps v. Kapnolas</u>, 308 F.3d 180 (2d Cir.2002) (prisoner stated claim under Eighth Amendment by alleging that he was given nutritionally inadequate food for two weeks).

In <u>Moss</u>, an inmate alleged that he had been deprived of food for four days as punishment for refusing to return a plastic cup to prison guards.  <u>Moss</u>, 450 F.Supp. at 593-94.  A prison rule requiring the return of food utensils had been promulgated to alleviate the problem of SHU inmates using the utensils to collect urine and feces to throw at guards. <u>Id.</u> at 593.  The judge in <u>Moss</u> observed that "[a]lthough being deprived of one or two meals might not be cruel and unusual punishment, prison officials cannot impose such severe sanctions for breaking a disciplinary rule, . . . on prisoners when there is no showing that the prisoner is engaging in the type of conduct the rule is designed to prevent." <u>Id.</u> at 596.  The <u>Moss</u> court held that the inmate's Eighth Amendment rights had been violated, noting that the punishment "was grossly disproportionate to the offense and went beyond what was necessary to achieve the state's goals." <u>Id.</u> at 596-97.

The Southern District of New York has held that a pre-arraignment detainee's claim that police officers "deprived him of food and water for two-and-one-half days and confined him in an overcrowded and unsanitary cell charg[ed] conduct sufficiently egregious to allow a reasonable inference of inadequate supervision amounting to deliberate indifference to plaintiff's constitutional rights." <u>Hodge v. Ruperto</u>, 739 F.Supp. 873, 878 (S.D.N.Y.1990).

---

[7]  The <u>Robles</u> court found that a complaint alleging that prison officials had withheld food from inmates for 12 days, three of which were consecutive, within a 53 day period, and had also served food contaminated with dust, rocks, glass and human waste, was sufficient to withstand dismissal. <u>Id</u> at 13, 15-16.

1    Thus, deprivations lasting as short a time as two-and-one-half days have been recognized in the

2    Second Circuit as being potentially severe enough to sustain a constitutional claim.

3             Relying on <u>Moss</u>, a district court in the Second Circuit also found that the

4    withholding of food from a prisoner for a period of approximately two days stated a claim under

5    the Eighth Amendment and was grossly disproportionate punishment for a prisoner's refusal to

6    comply with a rule requiring the return of food containers to prison guards when the prisoner had

7    not engaged in the kind of conduct that the prisoner had not engaged in that the rule was designed

8    to prevent. <u>Williams v. Coughlin</u>, 875 F.Supp. 1004, 1013 (W.D. N.Y. 1995).  "Furthermore,

9    several correctional guidelines and standards indicate that contemporary standards require prison

10   authorities to provide regular, daily meals to all prisoners, and they disapprove the use of food

11   deprivation as a disciplinary measure."[8]  <u>Id.</u> at 1013.

12            The <u>Williams</u> court also relied on a case from the Tenth Circuit, <u>Dearman v.</u>

13   <u>Woodson</u>, 429 F.2d 1288 (10th Cir.1970) (court could not conclude as a matter of law that

14   deprivation of food for 50 1/2 hours (a little longer than Williams went without food) was not

15

---

16      [8]   Courts may also use correctional guidelines and standards from a variety of sources to inform themselves of contemporary standards relating to the operation of corrections facilities.

17   <u>See</u>, <u>e.g.</u>, <u>Rhodes v. Chapman</u>, 452 U.S. at 343, 348, nn. 7, 13; <u>Estelle v. Gamble</u>, 429 U.S. at 103 n. 7.  The <u>Williams</u> court noted that several such documents indicated that "current standards

18   require the provision of as many as three meals per day, and disapprove the use of food deprivation as a disciplinary measure.  See, e.g., Manual of Standards for Adult Correctional

19   Institutions, American Correctional Association (1990), Standard 3-4309 ("[w]ritten policy, procedure and practice require that at least three meals (including two hot meals) are provided at

20   regular meal times during each 24-hour period, with no more than 14 hours between the evening meal and breakfast"); Standards for Criminal Justice, American Bar Association (1983), Standard

21   23-6.13(d) ("[a] prisoner ... placed in a more secure housing unit pursuant to disciplinary ... action ... should not be deprived of ... regular diet"); Federal Standards for Prisons and Jails,

22   United States Department of Justice (1980), Standard 4.08 ("[a]t least three meals, two of which are hot meals, are provided at regular meal times during each 24-hour period with no more than

23   14 hours between the evening meal and breakfast"), Standard 4.09 ("[w]ritten policy and procedure preclude the use of food as a reward or disciplinary measure"), and Standard 11.18

24   ("[w]ritten policy and procedure require that inmates in disciplinary detention *1013 and administrative segregation receive normal institution meals"); United Nations Standard

25   Minimum Rules for the Treatment of Prisoners (1955), Rule 20(1) ("[e]very prisoner shall be provided by the administration at the usual hours with food of nutritional value for health and

26   strength ..." (emphasis added))."  <u>Williams</u>, 875 F.Supp at 1012-13.

cruel and unusual punishment.) <u>Williams</u>, 875 F.Supp at 1012, citing <u>Dearman</u>, 429 F.2d at

1290.  Other courts have found varying days' worth of food deprivation were cognizable Eighth

Amendment violations.  <u>Beckford v. Portuondo</u>, 151 F.Supp.2d 204 (N.D.N.Y.2001) (denial of

two out of three meals each day for eight days); <u>Cooper v. Sheriff, Lubbock County, Texas</u>, 929

F.2d 1078, 1083 (5th Cir.1991) (noting that depriving a prisoner of adequate food is a form of

corporal punishment, and an allegation of deprivation of food for 13 days, 12 of which were

consecutive, presented a set of facts that might entitle the prisoner to relief).[9]  <u>See also</u> <u>Reed v.</u>

<u>McBride</u>, 178 F.3d 849, 853 (7th Cir.1999) (three to five days' deprivation of food to already

infirm inmate stated a claim);[10] <u>Simmons v. Cook</u>, 154 F.3d 805 (8th Cir.1998) (upholding

district court's conclusion that denial of four consecutive meals over two days supported Eighth

Amendment violation).

       The <u>Williams</u> court found that the defendants' motions for summary judgment

could not be granted on the basis that the deprivation suffered by Williams was not sufficiently

serious to be of constitutional dimension.  <u>Williams</u>, 875 F.Supp. at 1013.  However, the

<u>Williams</u> court refrained from entering judgment on behalf of Williams, finding that it could not

conclude that "no rational jury could find in favor of the defendants on the issue of the

seriousness of the deprivation. " <u>Id.</u>

       This court finds that plaintiff has demonstrated the objective prong of <u>Farmer</u>,

<u>supra</u>.  It is undisputed that plaintiff was not provided two meals per day for a minimum of three

days, for a total of six meals, based at a minimum on plaintiff's refusal to uncover the back

---

[9]  The <u>Cooper</u> court observed further that "we think it beyond dispute that a punishment
may be cruel and unusual when, although applied in pursuit of legitimate penal aims, it goes
beyond what is necessary to achieve those aims." <u>Id.</u>  Absent information as to the facts and
circumstances surrounding the withdrawal of food from the inmate, the court could not decide
whether the official actions were reasonable. <u>Id.</u> Therefore, the simple allegation that the inmate
had been deprived of food for 50 1/2 hours was sufficient to state a cause of action.  <u>Id.</u>

[10]  But see recent Seventh Circuit case finding no violation.  <u>Rodriguez v. Briley</u>, 403
F.3d 952, 952-53 (7th Cir.2005)(discussed <i>infra</i>)

1  window of his cell.  Moreover, plaintiff has submitted his own and two inmate declarations in

2  support of his position that defendant Cole failed to provide him two meals per day numerous

3  additional times during July and August of 2001.  (Foster Decl.; Opp'n., Attachment 1.)

4  Drawing all reasonable inferences in plaintiff's favor, a jury could find that plaintiff had been

5  denied meals on seven separate days, merely because plaintiff refused to remove window

6  coverings from his cell, particularly in light of plaintiff's nine pound weight loss.  This

7  constitutes a sufficiently serious deprivation to meet the objective prong of <u>Farmer</u>, <u>supra</u>.

8         In any event, there are material disputes of fact surrounding defendant Cole's

9  refusal to feed plaintiff:  defendant Cole contends plaintiff refused to remove window coverings

10  from the front cell window and that she was unable to see plaintiff in the cell well enough to

11  safely feed plaintiff; plaintiff contends he only refused to remove window coverings from the

12  back cell window and that with the bright light on, defendant Cole could see plaintiff in the cell

13  so that he could be safely fed.  In addition, defendants have not provided any evidence to

14  substantiate the nutritional value of the evening meal, that is, was the evening meal of sufficient

15  caloric level to sustain plaintiff for the twenty-four hour period.

16         Defendants argue that this court should adopt the reasoning of a recent case from

17  the Seventh Circuit Court of Appeals.  <u>Rodriguez v. Briley</u>, 403 F.3d 952 (7th Cir.2005).  The

18  <u>Rodriguez</u> court held that the denial of meals to a prisoner is not punishment within the meaning

19  of the Eighth Amendment if the denials are a response to the prisoner's refusal to obey a valid

20  institutional regulation.  <u>Rodriguez</u>, 403 F.3d at 952-53.  <u>Rodriguez</u> involved an inmate who had

21  been denied between 300 and 350 meals over the course of 18 months because he refused to

22  comply with a rule requiring him to store his belongings in a storage box before leaving his cell.

23  <u>Id.</u>  The court rejected the inmate's Eighth Amendment claim, stating that "deliberate

24  noncompliance with a valid rule does not convert the consequences that flow automatically from

25  that noncompliance into punishment. . . .  [B]y failing to comply with a reasonable condition on

26  /////

1  being allowed to leave his cell, and as a result missing out on meals, Rodriguez punished

2  himself."[11]  Id. at 952-53.

3         Here, defendants argue that it is undisputed that plaintiff refused to remove *all*

4  window coverings from his cell windows, that the prohibition against window coverings presents

5  a valid security concern, and that defendant Cole was justified in refusing to feed plaintiff

6  because she felt that there was a substantial risk to her safety in opening the food/cuff port

7  because she did not have a clear view of the entire cell.

8         This court does not find the Rodriguez reasoning persuasive.  Taking plaintiff's

9  evidence as true, that he had turned on his bright light and removed the paper from his front cell

10  window, there was no reason to deprive plaintiff of his meal, particularly in light of Warden

11  Runnels' clarification memo.  Although defendant Cole attempts to justify her actions based on

12  security concerns due to the recent altercations with black inmates on Facility C, there is no

13  evidence that plaintiff was involved in any of those incidents.  Moreover, defendant Cole cannot

14  impose such severe sanctions for breaking a disciplinary rule, as occurred in the instant case, on

15  prisoners when there is no showing that the prisoner is engaging in the type of conduct the rule is

16  designed to prevent.  Defendant does not claim that plaintiff threw or attempted or threatened to

17  throw urine or feces through the food/cuff port, nor does she allege that plaintiff had been found

18  to be in possession of a weapon.  While it may be understandable that defendant Cole was

19  sensitive to the threat of violence based on her recent experience of witnessing the injuries of the

20  female guard who was beaten unconscious, it was not appropriate for her to withhold plaintiff's

21  meals because he refused to remove the coverings from his rear cell window just because he was

22  black.  Lockdowns are frequent in prison and, as defendant Cole notes, feeding inmates via the

23

24         [11]  The Rodriguez court noted that its holding did not undermine the view that at some
   point, the denial of food to an inmate may violate the Eighth Amendment even if the denial is the
25  result of the inmate's own choice not to follow the rules.  Id. at 953 ("At some point, refusal to
   eat might turn suicidal and then the prison would have to intervene.  Likewise if noncompliance
26  with the rule were a product of insanity.") (internal citations omitted).

1   food/cuff port is always a security concern.  However, such is the business of prisons and officers

2   must find ways to address their security concerns without legitimizing the unconstitutional

3   deprivation of food.  This court is not persuaded that plaintiff should be deprived of his meals

4   simply because he violated a cell window covering regulation.[12]

5                    2.  Subjective Prong:  Deliberate Indifference

6                    Plaintiff argues defendant Cole's refusal to feed plaintiff after Runnels'

7   clarification memo clarifying the policy demonstrates Cole's intentional and deliberate attempt to

8   inflict injury on plaintiff.  (Opp'n. at 11.)  In addition, plaintiff notes that no other officers

9   refused plaintiff meals, only defendant Coles.  (Opp'n. at 12.)  Moreover, on each of the days

10  defendant Cole failed to provide plaintiff with his breakfast and lunch, other officers provided

11  him dinner without requiring him to remove the paper from his back cell windows.  (Foster Decl.

12  at 5.)

13                   As noted above, defendant Cole must have acted with a sufficiently culpable state

14  of mind.  Farmer, 511 U.S. at 837; Wilson v. Seiter, 501 U.S. 294, 302-03 (1991).

15                   Plaintiff has presented evidence that he was denied food by defendant Cole on at

16  least ten separate days:  breakfasts and lunches on July 21, 22, 28, 29, 2001, August 4, 5, 11, 12,

17  2001; and breakfasts on October 31, 2001 and January 2, 2003.  Defendants dispute most of this

18  evidence, but admit plaintiff was denied 6 meals between July and August, 2001.

19                   Viewing the evidence in the light most favorable to plaintiff, this court finds that a

20  reasonable jury could find that he was subjected to a substantial risk of serious harm to his

21  health.  Because food is a basic human need, defendant Cole should have been aware that

22  repeated failure to provide plaintiff with his meals, particularly two meals in the same day,

23  would subject plaintiff to a substantial risk of serious harm to his health sufficient to demonstrate

24  _____

25        [12] There were other options available to defendant Cole.  She could have sought the
    assistance of her supervisor.  She could have asked a different guard to feed plaintiff.  Plaintiff
    declared that no other guard required him to remove the window coverings nor refused to feed

26  plaintiff based on the presence of window coverings, unlike defendant Cole.

defendant Cole was deliberately indifferent to plaintiff's basic human need for food.  Defendant

Cole has provided no evidence that plaintiff received sufficient caloric intake by virtue of his

dinner meal alone.  Nor has defendant Cole provided evidence that she attempted to resolve

plaintiff's refusal to comply with the order by means other than simply depriving him of two

meals in one day, except on one occasion (she "believe[d] that on or about January 2, 2003, [she]

had to contact either [her] supervisor or [her] partner in regards to inmate Foster and his refusal

to remove a window covering."  (Cole Decl. at 8.))  Thus, the evidence here is sufficient, if

believed, to show defendant Cole acted with a sufficiently culpable state of mind to meet the

subjective prong of Farmer, supra.

D.  Qualified Immunity

        Defendants contend that they are entitled to qualified immunity because it was not

clearly established that denying plaintiff breakfast and lunch on ten separate occasions over an 18

month period as a result of plaintiff's refusal to comply with a valid directive would constitute

cruel and unusual punishment.  Defendants argue that the undisputed facts and evidence do not

implicate plaintiff's constitutional rights.  Moreover, defendants contend that at least one court

has held that the denial of meals is not punishment within the meaning of the Eighth Amendment

if the denials are a response to the prisoner's refusal to obey a valid prison regulation.  Rodriguez

v. Briley, 403 F.3d 952, 952-53 (7th Cir.2005).

        A two-part test applies to analysis of the qualified immunity defense.  Martinez, at

1183 (citing Saucier v. Katz, 533 U.S. 194, 201-02 (2001).  First, the court looks at "whether the

facts alleged 'show [that] the officer[s'] conduct violated a constitutional right," and second,

"whether the constitutional right in question was 'clearly established' such that 'it would be clear

to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Martinez,

id. (quoting Saucier, 533 U.S. at 201-02.)

        The Supreme Court has indicated that prison inmates may be placed under

conditions of confinement that include a restricted diet for limited periods of time.  Hutto v.

1  Finney, 437 U.S. at 686-87 ("[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable

2  for a few days and intolerably cruel for weeks or months").  It has been clear for over ten years

3  that prisons must provide adequate food to maintain inmate health.  See LeMaire v. Maass, 12

4  F.3d 1444, 1456 (9th Cir.1993); See also Keenan v. Hall, 83 F.3d 1038, 1091 (9th Cir.1996),

5  amended, 135 F.3d 1318 (9th Cir.1998).  Moreover, "[t]he more basic the need, the shorter the

6  time it can be withheld."  Hoptowit v. Ray, 682 F.2d 1237, 1259 (9th Cir. 1982).

7            In the instant case, the same disputes of fact that preclude summary judgment for

8  defendant Cole preclude a determination that defendant Cole is entitled to qualified immunity.

9  From a common sense perspective alone, one should know that repeatedly denying a prison

10  inmate two meals in one day deprives that inmate of a basic human need.  Attempting to justify

11  the deprivation of meals based on security reasons does not legitimize the act of withholding

12  meals.  Moreover, if plaintiff's version of events is correct, no reasonable correctional officer

13  could have believed that withholding plaintiff's breakfast and lunch on eight separate occasions

14  was lawful.  For all of the foregoing reasons, this court finds that defendant Cole is not entitled to

15  qualified immunity.

16            In accordance with the above, IT IS HEREBY RECOMMENDED that:

17            1.  Defendants' May 10, 2005 motion for summary judgment on plaintiff's shower

18  claim be granted;

19            2.  Defendants' May 10, 2005 motion for summary judgment on plaintiff's claims

20  against defendant Runnels be granted and defendant Runnels be dismissed from this action;

21            3.  Defendants' May 10, 2005 motion for summary judgment on plaintiff's claims

22  against defendant Cole be denied; and

23            4.  This case be referred back to the magistrate judge for further orders.

24            These findings and recommendations are submitted to the United States District

25  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

26  days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  October 11, 2005.


UNITED STATES MAGISTRATE JUDGE

1
fost1113.msj